# PENNSYLVANIA
# SPECIAL EDUCATION HEARING OFFICER

DECISION

DUE PROCESS HEARING

Name of Child:  Elizabeth Carlson
ODR #4924/04-05 KK

Date of Birth:  May 20, 1988

Dates of Hearing:
February 15, 2005
March 22, 2005
April 29, 2005
June 15, 2005

CLOSED HEARING

| Parties to the Hearing: | Representative: |
|---|---|
| Mr. and Mrs. Denis Carlson | Pro Se |
| 104 West Mermaid Lane | |
| Philadelphia, Pennsylvania 19118 | |
| | |
| School District of Philadelphia | Deborah DeLauro, Esquire |
| Office of General Counsel | Office of General Counsel |
| 440 North Broad Street, 3rd Floor | 440 North Broad Street, 3rd Floor |
| Philadelphia, Pennsylvania 19130 | Philadelphia, Pennsylvania 19130 |

| | |
|---|---|
| Date Record Closed: | July 7, 2005 |
| Date of Decision: | July 22, 2005 |
| Hearing Officer: | Linda M. Valentini, Psy.D. |

## Background

Elizabeth Carlson is an eligible student residing in the School District of Philadelphia (hereinafter District) who was placed[1] at the Pathway School (hereinafter Pathway), an Approved Private School for the 2002-2003 school year. An Agreement between the Parents and the District reached at a due process hearing on June 17, 2003 resulted in Elizabeth's being placed at Pathway for the 2003-2004 school year as well, with the District agreeing to pay the tuition and the fees for both school years. The agreement did not attach pendency to Pathway beyond the 2003-2004 school year, but instead made pendency a District IEP to be offered on or before May 15, 2004. However, Mr. and Mrs. Carlson, Elizabeth's parents (hereinafter Parents) elected to keep Elizabeth at Pathway for the 2004-2005 school year and now seek tuition reimbursement for the year. The District maintains that the IEP it offered to Elizabeth for the 2004-2005 school year was appropriate and fulfilled the terms of the Agreement, and that tuition reimbursement should be denied.

## Procedural History

This case spanned a four-month period for reasons beyond the control of the parties and the hearing officer. For the first date, February 15th, the attorney for the District did not receive a hearing notice from the Office for Dispute Resolution and was not present for the evening hearing, and it is still unclear whether the problem lay in the transmission or the reception of the Notice. At the second session on March 22nd Mr. Carlson became quite suddenly ill and the hearing ended early. At the third session, April 29th, although the hearing officer intended to finish the hearing by running into the evening, the Parents informed her that it was the night of Elizabeth's prom and asked for, and were granted, the courtesy of ending the hearing in late afternoon. At the fourth session, June 15th, the hearing was finished. Scheduling difficulties arose because of a number of factors related to the work schedule of Mrs. Carlson, the calendars of Mr. Carlson, the hearing officer and the District's attorney, and Elizabeth's participation in skiing in the Special Olympics. The Parents' request that they be permitted to submit written closing statements extended to July 7th the time period that the record was kept open. This decision was written on Day 15 after the closing of the record, with Day 1 being July 8th.

## Issues

1. Did the School District of Philadelphia offer Elizabeth Carlson a free appropriate public education (FAPE) for the 2004-2005 school year as articulated in the IEP and NOREP of May 7, 2004?

2. If the District did not offer Elizabeth FAPE, is the placement chosen by the Parents appropriate?

---

[1] The record is unclear as to whether the Parents unilaterally placed Elizabeth at Pathway in 2002-2003, or if there was a hearing, and placement then resulted from a hearing officer decision or an from an agreement with the District. However, this does not have bearing on the instant matter.

3. If the District did not offer FAPE, and the placement chosen by the Parents is appropriate, does a balancing of the equities remove any or all of the District's obligation to provide tuition reimbursement?

Findings of Fact

1. Elizabeth Carlson is an eligible 17-year-old student with Mild Mental Retardation and Attention Deficit Disorder who resides in the School District of Philadelphia. (S-6)

2. On June 17, 2003, prior to convening a scheduled due process hearing, the District and the Parents entered into a settlement agreement. Both parties were represented by counsel: for the District, Glenna Hazeltine, Esquire and for the Parents, Dennis McAndrews, Esquire. (NT 34, 39; S-1)

3. The Parents' attorney read the terms of the Agreement into the record at the June 17th hearing session. (S-3)

4. The Agreement provided that the District would pay Elizabeth's tuition and required fees for the 2002-2003 and the 2003-2004 school years at Pathway School, an Approved Private School. (NT 34; S-3)

5. The Agreement provided that "pendency for the 2003-2004 school year is the school district's IEP which was promulgated on or about June 11, 2003. And the location of that placement would be the Swenson Arts and Technology program. That would be in the event that for some reason Elizabeth would be unable to complete the year at Pathway as described earlier in this statement." (NT 35; S-3)

6. Although other locations were discussed, for example Northeast High School and Roxborough High School, counsel for the parties determined that Swenson would be the location most acceptable to the Parents at the time. (NT 36)

7. The Agreement also provided that "pendency after May 15th, 2004 (sic) will be a school district IEP offered on or before that date. If the school district fails to offer an IEP on or before that date, pendency would be tuition and reasonable fees at Pathway thereafter." (NT 35-36, 42; S-3)

8. Additional waiver language was attached to the transcript of the due process hearing as per comments on the record. (S-3)

9. The additional waiver language includes the provisions that the Parents warrant that they have had the opportunity to consult with counsel and that they are satisfied with the representation they received from their counsel. (NT 36; S-3)

10. Both the Parents and the District stated their acceptance of the Agreement on the record on June 17, 2003. (S-3)

11. The hearing officer, Ms. Linda Stengle ended the hearing by stating, "Now that the matter is resolved, I'm hereby dismissing the matter and relinquishing jurisdiction". The parties did not ask the Hearing officer to retain jurisdiction while a written Agreement was being prepared. (S-3)

12. A "Draft" Agreement conforming to the Agreement terms read into the record by the Parents' attorney (with the sole addition of the amount of the Parents' attorney fees to be paid by the District) was written by the Parents' attorney and sent to the District's attorney by the Parents' attorney on July 31, 2003.[2] (NT 34, 37, 38; S-1, S-2, S-3)

13. On August 19, 2003 the Parents' attorney sent correspondence to the District's attorney relative to the District's upholding its responsibility to the terms of the Agreement. (S-1)

14. As per the terms of the Agreement the Parents sent Elizabeth to the Pathway School for the 2003-2004 school year, and the District paid the tuition and related costs retrospectively for the 2002-2003 school year and prospectively for the 2004-2004 school year.

15. In preparation for developing its IEP as per the Agreement, the District evaluated Elizabeth on April 21, 2004. (S-5)

16. The District psychologist went to Pathway to evaluate Elizabeth. (NT 244-245)

17. The District psychologist interviewed Elizabeth's teacher and had her fill out a measure of adaptive functioning as well. (NT 251)

18. A Wechsler Intelligence Scale for Children – 4th Edition (WISC-IV) Full Scale IQ score was reported by the District psychologist in April 2004 as being 56, at the 0.2 percentile. This score was consistent with a Stanford Binet, 4th Edition (SB-IV) Test Composite score reported by an independent evaluator in June 2001 as being 61, at the 1st percentile. (S-5)

19. A consistent test finding in the 2001 and the 2004 evaluations was that Elizabeth's processing of visual information was stronger than her verbal processing. (S-5)

20. In April 2004, testing by the District psychologist with the Wechsler Individual Achievement Test – 2nd Edition (WIAT-II) revealed Word Reading to be at Standard Score 52 at the 0.1 percentile and Reading Comprehension to be at

---

[2] There was some minor language that did not change the intent or the substance of the Agreement read into the record. For example, "reasonable" fees at Pathway was changed in the draft to "mandatory" fees.

Standard Score 40 at the <0.1 percentile. Math Numerical Operations and Math Reasoning were both at Standard Score 40, at the 0.1 percentile. Spelling was at Standard Score 59, at the 0.3 percentile. (S-5)

21. The April 2004 WIAT-II grade equivalents were as follows: Word Reading 2.8, Pseudoword Decoding 1.8, Numerical Operations K.8, Math Reasoning 2.1, Spelling 2.3. (NT 246-247; S-5)

22. Based on observations of Elizabeth and on her test-taking behavior the District psychologist notes that her curriculum-based functioning may be higher than her performance on a standardized measure given according to standardized methods. (NT 246-247, 261)

23. In April 2004 with her Pathway teacher (2003-2004) as informant on the Adaptive Behavior Assessment System, Elizabeth's General Adaptive Composite was 84, at the 14.3 percentile. With 10 being an Average Scaled Score, Elizabeth demonstrated strengths in her scores of 10 on School Living, 9 on Health and Safety, 8 on Leisure, 9 on Self-Direction and 9 on Social. She demonstrated weaknesses in her scores of 3 on Communication and 3 on Self-Care. Community Use was 6 and Functional Academics was 5. (NT 248, 266; S-5)

24. Elizabeth's areas of functioning range widely, and although she falls into the mentally retarded range, some of her academic skills are stronger than those of many life skills students, and she has a number of other interests in activities in which she participates. (NT 378, 381)

25. Elizabeth participates in a number of sports including skiing, golf and horseback riding and gained a place in national competition in skiing in the Special Olympics. Elizabeth races in skiing and can tell you the time of her race in 1/100's of a second. (NT 74; S-5)

26. Elizabeth's accomplishment in sports is integral to her self-esteem. (NT 378)

27. Elizabeth is physically very pretty and looking at her someone may not be able to tell she is a life skills student. (NT 377)

28. According to Elizabeth's classroom teacher (Pathway, 2004) Elizabeth was elected to Student Council in 2003-2004 and gave a speech to the entire student body. (NT 115-116; S-6)

29. Elizabeth's classroom teacher (Pathway, 2004) reported that organization and an awareness of her surroundings are strengths for Elizabeth, as is her consideration for others who are less fortunate. (S-6)

30. One of Elizabeth's areas of highest progress over the past several years is her social growth, as observed by her teacher at Pathway and an independent

evaluator who testified for the Parents. Initially she was shy and withdrawn and walked with her head down and by the end of the 2003-2004 school year she had changed dramatically, with increased self-esteem. She greeted people, held her head up, was comfortable navigating around the campus independently and had a group of friends in and outside school. (NT 111, 379)

31. Elizabeth participated in a work program at a Longhorn Steak House during the 2003-2004 school year. (S-5)

32. At her job at Longhorn Steak House Elizabeth had no difficulty doing the tasks assigned, asked for more supplies when they were needed and indicated when she was finished. She interacted with several different restaurant employees. It was noted that she had received a promotion. (NT 113; S-5, P-7, P-8)

33. The District's special education transition case manager observed Elizabeth at her job at the Longhorn Steak House twice, at least once with a Pathway teacher who commented on what Elizabeth was doing, once noting that Elizabeth needed some prompting to use social interaction to receive direction for a transition from ending one task to beginning another. (NT 276, 283-284, 334)

34. An Occupational Therapy Evaluation was performed in conjunction with the spring 2004 District evaluation. (S-5)

35. The occupational therapist observed Elizabeth in her classroom and at her work place at Longhorn Steak House as well as speaking with Elizabeth's teacher. Although Elizabeth was found to be functional in all areas of her school program, she did demonstrate motor planning deficits that interfere with her learning new tasks. (S-5)

36. A Speech/Language Evaluation was performed on May 5, 2004 in conjunction with the District evaluation. (S-4)

37. Using the Fisher-Logeman Test of Articulation Competence, the speech/language pathologist found that Elizabeth's articulation was correct except for *f/th* (voiceless) and *d/th* (voiced). The evaluator opined that considering the test results continuation of production work for the 'th' sound might not be worthwhile. (S-4)

38. On the Fullerton Language Test for Adolescents Elizabeth showed deficiencies in correct usage according to morphological elements of words, in identifying and retrieving and formulating definitions for homonyms, and in grammatical competence. (S-4)

39. Elizabeth's language skills have improved considerably. As of May 2004, although she needed to increase her utterance length she could speak in full sentences. Although she was limited in what she told you, it was comprehensible.

Her eye contact has improved, her body language was more relaxed and peer interactions were improving with more room for improvement. (NT 197)

40. An Evaluation Report (ER) was produced on April 23, 2004. (S-6)

41. Before the IEP meeting convened the District psychologist and Mrs. Carlson had an opportunity to spend some time together. Mrs. Carlson read over the ER and had the opportunity to make comments or address questions to the psychologist. (NT 249)

42. Mrs. Carlson agreed to waive the ten-day period between receiving the ER and holding the IEP meeting, and signed the standard waiver form at the table. (NT 203-204, 345-346)

43. Elizabeth's mother signed and indicated her agreement with the information in the Evaluation Report, as did all other multidisciplinary team members including staff from the Pathway School. (NT 266-268, 403; S-7)

44. In preparation for the IEP meeting two District employees, one from Roxborough High School (Elizabeth's neighborhood school) and one the special education transition case manager, made three visits to Pathway. They observed Elizabeth and they met with representatives from Pathway and with them created a draft IEP document to be used at the IEP meeting. Creating a draft IEP prior to an IEP meeting is standard District practice. (NT 42, 59-60, 124-125, 229, 257, 274-275, 285, 328, 339)

45. A lengthy IEP meeting was held on May 7, 2004 and a typed copy of the final IEP was forwarded to the Parents with a letter dated May 13, 2004. (P-1)

46. During the IEP meeting, with the Parent and three Pathway staff present, the goals and objectives were discussed. As the District's special education transition case manager recalls it, the IEP team "went over every possible word" with Elizabeth's teacher, "and she agreed with it". (NT 176-177, 254, 285, 339)

47. During the IEP meeting, characterized by Pathway's Speech/Language Department Coordinator as "a planning meeting", there was "a considerable amount of dialogue going back and forth because of trying to word the goals and objectives measurably. But we did it, it just took its time and it was slow". (NT 192-193)

48. Although the IEP meeting "was long, and a bit tedious" the participants "were able to say if we needed to be kept up to speed for some reason". (NT 193)

49. The staff from Pathway who were present at the IEP meeting had input into the IEP. (NT 209, 214, 233)

50. Pathway staff did not provide information about formal academic levels at the IEP meeting. (NT 255)

51. Many opportunities were given during the meeting for participants, including Mrs. Carlson, to add information or state their agreement. The special education case manager for the Northwest Region of the city and others specifically asked Mrs. Carlson whether or not she understood the goal and whether or not it was acceptable. (NT 254, 285-286)

52. At the IEP meeting Mrs. Carlson did not express concerns about the goals contained in the draft IEP or ask questions about the adaptive functioning levels. (NT 44, 75, 178, 180-181, 256)

53. At the IEP meeting Mrs. Carlson did not say that she found something unacceptable or inappropriate. She was given ample opportunity to speak. (NT 349)

54. As of the date of the IEP meeting Elizabeth was 15 years 11 months old. She was in 10th grade, going in to the 11th grade. (P-2[3])

55. Duration of services under the May 7, 2004 IEP was to be from May 10, 2004 to May 7, 2005. (P-2)

56. IEP team members included Mrs. Carlson[4], Elizabeth's grandmother, a regular education teacher, a special education teacher, a local educational agency representative, the low-incidence disabilities support person, the assistant education director at Pathway, Elizabeth's then-current teacher at Pathway, another (unidentified) Pathway staff member, the District psychologist, the special education case manager, and the special education liaison from the regional office.[5] Individuals other than those on the sign-in sheet also attended.[6] (NT 106, 365, 401-402; P-2)

57. The Parent signed for having received the Procedural Safeguards notice on May 4, 2004. (P-2)

58. Based on the longstanding nature of Elizabeth's disability she would have had at least annual IEP meetings nearly all, if not all, her educational career. Mrs. Carlson testified that she has "been to so many IEP meetings".(NT 359-360, 410-411)

---

[3] As the Parents' copy of the IEP was determined to be the final copy it was used during the hearing. The handwriting on the document is from the Parents' prior review and was not considered by the Hearing Officer and should not be considered part of the document. (NT 81)

[4] Mrs. Carlson is a Head Start nurse, having gone to Penn State University for undergraduate and to the University of Pennsylvania for graduate school. (NT 399)

[5] The position or title of a final individual was not given although his signature appeared. (P-2)

[6] Mrs. Carlson recalls more than one sing-in sheet going around to the participants. (NT 402-403)

59. As Elizabeth would turn sixteen during the duration of the IEP a Transition Plan was developed addressing post-secondary training, employment, and community living areas including residential, community participation and recreation. (P-2)

60. District staff interviewed Elizabeth and her Pathway teacher to gather information to assist in developing the Transition Plan. (NT 277-278, 281-282, 321)

61. The IEP contains Elizabeth's Present Levels of Educational Performance as per the Evaluation Report of April 23, 2004. Elizabeth's Strengths and Needs are described as per the Evaluation Report. The Present Levels of Educational Performance sections were developed in consultation with the Pathway staff (interviews by the District psychologist, a staff member from Elizabeth's neighborhood school and the special education transition case manager) as well as by reviewing her school records and the evaluation findings. (NT 44, 276; P-2)

62. The Present Levels of Educational Functioning were read at the IEP meeting. "Every word was read" according to the District's special education transition case manager, and Elizabeth's Pathway teacher and the Pathway speech/language director agreed with those present levels. There was no dissension. (NT 348-349, 366)

63. The IEP provides Annual Goals and Short Term Objectives to address Elizabeth's needs in the areas of Interpersonal Communication, Functional Academics (reading and math), Pre-Vocational Skills and Vocational Skills and Speech/Language. (P-2)

64. When a student enters a special education program in the District, particularly a low-incidence program, consideration is given to the fact that the student may have varying levels of competence and an individualized program, a "blended" program is produced as necessary so that, for example, the student might receive some instruction in the Life Skills classroom but may go out to a Learning Support classroom for other instruction. (NT 47-48, 347)

65. The IEP's of students in the District are adapted as necessary in response to progress monitoring which happens four times a year. (NT 348)

66. The goals and objectives are specific and measurable and relate to Elizabeth's identified needs and her present levels of functioning in each of the areas. The criteria for levels of achievement for the 1st quarter are given, as are the methods of evaluation and the review schedule. The IEP contains information about how Elizabeth's progress will be reported to the Parents. (P-2)

67. Specially designed instruction includes a variety of techniques and methods that address Elizabeth's learning style and her difficulties in processing. The specially designed instruction is specific to each goal/objectives set. (P-2)

68. The IEP provides for Related Services in Speech (one session weekly) and Occupational Therapy (consultation model, ten times yearly). (P-2)

69. In addition to speech/language goals and objectives suggested by the District's speech/language pathologist, Pathway's speech/language coordinator was invited to write drafts of goals and objectives from her perspective, some of which but not all of which were incorporated into the final IEP verbatim and some of which were worded differently. (NT 200-201, 211-213, 229; S-4, P-2, P-5)

70. Both the District's speech/language pathologist and Pathway's speech language director required more revisions to be made to the IEP than anyone else at the table did. (NT 360)

71. The IEP specifies how the school staff will be supported and by whom in delivering Elizabeth's IEP. (P-2)

72. The IEP provides for a Life Skills Support program, Full Time provided in a regular education facility. (P-2)

73. The IEP provides that Elizabeth will participate in the PASA and that her performance will be documented by videotape. (P-2)

74. Elizabeth's May 7, 2004 IEP could have been delivered at any high school in the District. (NT 340)

75. The May 7, 2004 IEP could have been implemented at Roxborough High School. (NT 368, 371)

76. At Roxborough High School Elizabeth could receive programming in Life Skills Support as well as Learning Support, depending on her needs (a "blended program"). (NT 368)

77. Roxborough High School has vocational training opportunities. (NT 368)

78. Roxborough High School, and perhaps Swenson, present the situation that Elizabeth would need supervision if she moved throughout the building so that she wouldn't be taken advantage of and to help her feel safe and secure so that she can learn. (NT 382-385, 392-393)

79. The May 7, 2004 IEP could have been delivered at Swenson. (NT 372)

80. Swenson provides a calm school environment. (NT 383)

81. Elizabeth could be provided a carefully monitored program at Swenson that meets her individual needs. (NT 383,386, 388-389, 391)

82. At Swenson, provided she is placed in 11th or 12th grade, she could participate in a computer animation class. (NT 386-388)

83. Elizabeth could participate in team sports at Swenson if she were good enough to make the team. (NT 395)

84. Swenson has opportunities for vocational experience, as does Roxborough, although, as Swenson is set up as a vocational center, there are more after school job opportunities. (NT 367-368, 372)

85. If Elizabeth needed to be travel-trained this training could take place at any District school. However, the District would not insist on travel training. (NT 368-369)

86. Pathway serves a variety of students who have learning disorders, neuropsychiatric disorders and problematic school histories. Students include those who have autistic spectrum disorders and those who are nonverbal. (NT 237)

87. There are eight students in each classroom and the classrooms have a teacher and an aide. (NT 237)

88. As of the date of the third hearing session there were 54 residential students and 114 day students at Pathway. Students come from as far away as California and Texas. (NT 238)

89. Pathway offers Elizabeth a "practical academics" or functional skills program, a vocational program and the opportunity to participate in sports. (NT 113, 115, 238)

## Credibility of Witnesses

The hearing officer must make a determination regarding credibility of witnesses. As regards the District's witnesses, all were credible. As regards the Parents' witnesses, all were credible except Elizabeth's teacher from Pathway. This individual was not found to be credible and her testimony was therefore not given much weight as she put forth many criticisms of the May 7, 2005 IEP even though she had participated in a lengthy meeting where the document was created and had more than ample opportunity to voice criticism at that time and advocate for changes. The private psychologist who testified for the Parents was impressive in her balanced and fair approach and her clear honesty in responding to questions. Her participation was particularly appreciated by this hearing officer. Mrs. Carlson testified in this hearing. As she is Elizabeth's mother, no determinations will be made regarding her credibility. Although he did not testify, Mr. Carlson demonstrated very able *pro se* representation and is to be commended for his excellent overall grasp of the process.

Discussion and Conclusions of Law

Legal Basis
Tuition Reimbursement
Parents who believe that a district's proposed program is inappropriate may unilaterally
choose to place their child in another placement. The right to consideration of tuition
reimbursement for students placed unilaterally by their parents was first clearly
established by the United States Supreme Court in Burlington School Committee v.
Department of Education, 471 U.S. 359, 374 (1985). A court may grant "such relief as it
determines is appropriate". "Whether to order reimbursement and at what amount is a
question determined by balancing the equities." Burlington, 736 F.2d 773, 801 (1st Cir.
1984), *affirmed on other grounds*, 471 U.S. 359 (1985).

In 1997, a dozen years after Burlington the reauthorized Individuals with Disabilities
Education Act (IDEA) specifically authorized tuition reimbursement for private school
placement:

> (i)In General. – Subject to subparagraph (A) this part does not require a local
> education agency to pay for the cost of education, including special education
> and related services, of a child with a disability at a private school or facility if
> that agency made a free appropriate public education available to the child and
> the parents elected to place the child in such a private school or facility.

> (ii)Reimbursement for private school placement. -If the parents of a child with
> a disability, who previously received special education and related services
> under the authority of a public agency, enroll the child in a private school
> without the consent of or referral by the public agency, a court or hearing
> officer may require the agency to reimburse the parents for the cost of that
> enrollment if the court or hearing officer finds that the agency has not made a
> free appropriate public education available to the child in a timely manner
> prior to that enrollment. 20 U.S.C. § 1412(a)(10)(C)(ii)

Florence County Sch. Dist. Four V. Carter, 114 S. Ct. 361 (1993) had earlier outlined the
Supreme Court's test for determining whether parents may receive reimbursement when
they place their child in a private special education school. The criteria are: 1) whether
the district's proposed program was appropriate; 2) if not, whether the parents' unilateral
placement was appropriate, and; 3) if so, whether the equities reduce or remove the
requested reimbursement amount.

FAPE
Elizabeth is an eligible handicapped student, and as such is entitled to the protections of
the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. Section 1412, and its
implementing regulations (34 C.F.R. Part 300), and Chapter 14 of the Pennsylvania

Code.[7] The IDEA requires that states provide all eligible students with a free appropriate public education (FAPE). FAPE is defined in part as: individualized to meet the educational or early intervention needs of the student; reasonably calculated to yield meaningful educational or early intervention benefit and student or child progress; provided in conformity with an IEP.

An appropriate IEP is one that meets the procedural and substantive regulatory requirements and is designed to provide meaningful educational benefit to the child. (Board of Education v. Rowley, 458 U.S. 176, 102 S. Ct. 3034 (1982); Rose by Rose v. Chester County Intermediate Unit, 24 IDELR 61 (E.D. PA. 1996). The IEP must be likely to produce progress, not regression or trivial educational advancement [Board of Educ. v. Diamond, 808 F.2d 987 (3d Cir. 1986)]. Polk v. Central Susquehanna IU #16, 853 F.2d 171, 183 (3rd Cir. 1988), cert. denied, 488 U.S. 1030 (1989), citing Board of Education v. Diamond, 808 F.2d 987 (3rd Cir. 1986) held that "Rowley makes it perfectly clear that the Act requires a plan of instruction under which educational progress is likely." (Emphasis in the original). The IEP must afford the child with special needs an education that would confer meaningful benefit. Additionally, the court in Polk held that educational benefit "must be gauged in relation to the child's potential."

Later decisions expanded the understanding of Rowley. In the years immediately following Rowley, a number of Circuit courts ruled that all procedural violations, regardless of their impact, constituted per se violations of the Act, and were adequate grounds by themselves for holding that the school failed to provide FAPE. However, while the courts have continued to take seriously Rowley's emphasis on the importance of procedural protections, courts have come to consider the seriousness of the procedural violation and its impact on the child and family in determining whether the IDEA was violated. Quoting from Amann v. Stow School System, 982 F.2d 644, 652 (1st Cir. 1992), the standard is there must be "some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits".

Guidance for determining the factors comprising "meaningful benefit" is offered in Cypres v. Fairbanks, 118 F.3d 245, 253 (5th Cir. 1997) as follows:

1. The program must be individualized on the basis of the student's assessment and performance;
2. The program must be administered in the least restrictive environment;
3. The services must be provided in a coordinated and collaborative manner by the key "stakeholders"; and
4. Positive academic and nonacademic benefits must be demonstrated.

The IEP for each child with a disability must include a statement of the child's present levels of educational performance; a statement of measurable annual goals, including

---

[7] This matter was initiated and concluded before the promulgation of the reauthorized IDEIA 2005 and therefore all statutory cites are to IDEA 1997 and corresponding federal and state regulations.

benchmarks or short-term objectives, related to meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum and meeting the child's other educational needs that result from the child's disability; a statement of the special education and related services and supplementary aids and services to be provided to the child...and a statement of the program modifications or supports for school personnel that will be provided for the child to advance appropriately toward attaining the annual goals (and) to be involved and progress in the general curriculum...and to be educated and participate with other children with disabilities and nondisabled children; an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class... CFR §300.347(a)(1) through (4)

<u>Least Restrictive Environment</u>
In determining the educational placement of a child with a disability...each public agency shall ensure that unless the IEP of a child with a disability requires some other arrangement, a child is educated in the school that he or she would attend if nondisabled. CFR §300.552(c)

Each public agency shall ensure that to the maximum extent appropriate, children with disabilities...are educated with children who are nondisabled; and that special classes, separate schooling, or removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. CFR §300.550(b)(1) and (2)

IDEA's least restrictive requirement provides that states must ensure that

> To the maximum extent appropriate, children with disabilities are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 20 U.S.C. Section 1412(a)(5)(A)

This requirement was unequivocally enforced in <u>Oberti v. Board of Education of the Borough of Clementon</u>, 995 F.2d 1204, 1215 (3d Cir. 1993), a landmark case. Under <u>Oberti,</u> in deciding whether a school district has included an eligible child in regular education to the maximum extent appropriate, consideration must be given to: 1) the efforts of the school district to include the student in a regular education classroom with supplementary aids and services; 2) the educational benefits available to the child in the regular classroom, and 3) any possible negative impact on the education of the other students. The burden of proof rests with the school district to prove that its proposed program complies with the mainstreaming requirement. Before moving a student into a more restrictive setting, it must first be determined that placement in the regular education classroom cannot be achieved satisfactorily. Even if such is the case, the district must still include the student in regular education programming to the maximum extent appropriate. *Id.* at 1218.

The range of supplementary aids and services includes:

> resource rooms and itinerant instruction, speech and language therapy, special
> education training for the regular teacher, behavior modification programs, or any
> other available aids or services appropriate to the child's particular disabilities. *Id.*
> at 1216, quoting Greer, 950 F.2d at 696.

Discussion

Agreement

As a threshold issue, this hearing officer must address whether the parties were bound by
an Agreement or not. The Parents, at various points in the proceedings, noted that one
particular document in evidence (S-1), the Draft Agreement drawn up by their attorney
and sent to the District, was not a signed copy. (NT 49-50, 311, 405) There is no
evidence one way or another that a copy of the Agreement was signed. However, this
hearing officer finds that a valid and binding Agreement existed between the parties for
the reasons put forth below.

First, at the due process hearing on June 17, 2005 the Parents' attorney read the
Agreement into the record. The Parents and the District assented to the Agreement on the
record. The record is devoid of any language to the effect that the Agreement was not
official until the parties signed it, and there is no language indicating that the hearing
officer would retain jurisdiction until a copy of the Agreement was signed. To the
contrary, Hearing Officer Stengle presided over the Agreement's being read into the
record and at the end of the hearing relinquished jurisdiction. (FF 3, FF 3, FF 10, FF 11)
This was and remains proper procedure when an Agreement is reached and read into the
record.

Second, further inquiry into the existence of an Agreement between the parties reveals
that the Parents' attorney sent correspondence to the District's attorney regarding the
District's not yet having fulfilled part of the Agreement. This correspondence
presupposes the existence of an Agreement to fulfill. (FF 13)

Third, and most importantly, the Parents sent Elizabeth to Pathway for the 2003-2004
school year, and the District paid Elizabeth's tuition for that year and for the preceding
year. (FF 14) It is disingenuous of the Parents, having reaped the tuition and related costs
benefit of the Agreement, to now claim that no Agreement existed.

The discussion will proceed from the fact that a valid Agreement existed between the
parties in this matter.

Procedural Violations

Contrary to the Parents' beliefs (see opening statement and closing statement of the
Parents), this hearing officer finds that no procedural violations occurred. Although there
were typographical or clerical errors on the IEP, for example listing 9th instead of 10th
grade, these did not compromise Elizabeth's ability to receive meaningful educational
benefit. (P-2) Although the District presented Mrs. Carlson with the Evaluation Report
on the day of the IEP meeting, she signed a waiver allowing the IEP meeting to go

forward without a ten-day delay. (FF 40, FF 42) The District was within the bounds of acceptable customary practice to prepare a draft IEP prior to a large IEP meeting, and was not obligated by statute or regulations to circulate the draft to team members prior to the meeting. Regarding whether or not the District provided Pathway with a final typed copy of the IEP, the evidence is contradictory, but even if the District did not so provide there was an easy remedy as Pathway could have called and asked that a copy be faxed. Given that it has been determined that no procedural violations occurred, it is not necessary to examine whether Elizabeth was deprived of educational benefit or if the Parents were deprived of meaningful participation.

## FAPE

A disabled student is entitled to a free, appropriate public education. As in many due process cases, this matter turns on the concept of "appropriate". An IEP need not provide "optimal" benefit. If personalized instruction is being provided with sufficient supportive services to permit the student to benefit from the instruction the child is receiving a "free appropriate public education as defined by the Act." Polk, Rowley. Although the Parents' desire that their daughter be educated in the best possible placement, or a placement that is, in Mrs. Carlson's words, "perfect" for her (NT 404) is entirely understandable, neither federal nor commonwealth statutes or case law provide for a maximization of a student's potential. Just as parents with the means to do so sometimes place their typically developing children in private schools, believing that various factors including the location or the course offerings may be preferable to public school, parents have the same right to provide what they consider the best placement for their child who is disabled. However, if the public school district can show that it offered an appropriate IEP, the parents must utilize a private school at their own expense. In frequently repeated homespun language, the state will provide a Ford, not a Cadillac, and as long as the Ford is in working condition and can take the child to a reasonably appropriate educational destination, a Cadillac has to be at the parents' own expense.

The federal government holds Districts to very a high standard in terms of the mandate to provide a disabled student with an appropriate program in the least restrictive environment (LRE). In fact, it is in the very area of LRE that the statutes loudly and clearly articulate the notion of "maximum": *"To the maximum extent appropriate, children with disabilities are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."* Insofar as this expectation for inclusion is concerned, an *appropriate* public school setting where there are typically developing peers is preferable to a school addressing only disabled children. It is only when a school district fails to offer an appropriate program, or when a child's disability is such that a segregated setting is the least restrictive environment, that consideration is given to public funding for a segregated setting. Even in those instances LRE must be considered as the presumptive option, although it may not be the final determining factor.

We now turn to the IEP offered to Elizabeth. First this hearing officer notes that the IEP was offered in a timely fashion pursuant to the June 17, 2003 Agreement (FF 7, FF 45). As regards program, the May 7, 2004 IEP proposed for Elizabeth contains every element required by federal regulations and by state regulations (which adopt the federal regulations by reference in this area). Elizabeth's proposed IEP includes a statement of her present levels of educational performance; a statement of measurable annual goals, including benchmarks or short-term objectives, related to meeting her needs that result from her disability to enable her to be involved in and progress in the general curriculum and meeting her other educational needs that result from her disability; a statement of the special education and related services and supplementary aids and services to be provided to Elizabeth and a statement of the program modifications or supports for school personnel that will be provided for Elizabeth to advance appropriately toward attaining her annual goals and be involved and progress in the general curriculum. The IEP includes a transition plan. The IEP provides for her to be educated and participate with other children with disabilities and as well as with nondisabled children and puts forth an explanation of the extent to which she will not participate with nondisabled children in the regular class. As set forth in the Findings of Fact 59, 61, 63, 66, 67, 68 and 71, these elements are clear and complete, and goals and objectives are specific and measurable with the method and schedule of evaluation set forth clearly. Modifications and specially designed instruction are extensive. It is the finding of this hearing officer that the May 7, 2004 IEP offered by the District to Elizabeth exceeded the standard of appropriateness.

It was clear throughout the hearing that the Parents' primary objection to the District's offer of FAPE was the placement, not necessarily the actual program. Elizabeth had a good experience at Pathway, and had made progress, and the Parents were understandably desirous that she remain there. Although this hearing officer can sympathize with this point of view, there are no grounds upon which she can find the District's placement offer inappropriate. Both Roxborough and Swenson can deliver Elizabeth's IEP. Swenson, the school for which the Agreement provides, can offer Elizabeth the classes, the instruction, and the supports she requires to make meaningful educational progress. The Parents and the private psychologist who testified on their behalf are concerned about Elizabeth's safety in the public school setting, as would any parent be for any child in any setting. In the event that Elizabeth requires a one-on-one aide to accompany her if her program requires that she move from one classroom to another, this must be done until such time as Elizabeth feels secure in her surroundings. This may not take an inordinate amount of time. Elizabeth is a student who, under the supervision of her parents, has participated in Special Olympics competitive sports and who has traveled out of the state to do so at the National level. In fact, one of the hearing sessions was scheduled around her having to spend several days in quite distant locations to which she most likely took an airplane. Her parents have, albeit watchfully, been nudging her toward mainstream activities enjoyed by typical teenagers. She will soon gain greater independence in a world with which she must become even more increasingly familiar. The District's offer, Swenson, offers a setting that can meet her academic needs in the least restrictive environment and in which she can further her nicely developing adaptive functioning skills.

As this hearing officer finds that the District has met its burden of proving that it has offered Elizabeth a free appropriate public education, it is not necessary to examine whether or not Pathway is appropriate and there is no need to balance the equities in this matter.

Order

It is hereby ORDERED that:

1. The School District of Philadelphia did offer Elizabeth Carlson a free appropriate public education (FAPE) for the 2004-2005 school year as articulated in the IEP and NOREP of May 7, 2004. The Parents are not due tuition reimbursement for Elizabeth's 2004-2005 school year at Pathway.

2. As the District did offer Elizabeth FAPE, the appropriateness of the placement chosen by the Parents does not need to be examined.

3. As the District did offer Elizabeth FAPE, a balancing of the equities is not necessary.

July 22, 2005
Date

*Linda M. Valentini, Psy.D.*
Linda M. Valentini, Psy.D.
Hearing Officer