# SPECIAL EDUCATION DUE PROCESS APPEALS PANEL REVIEW
# COMMONWEALTH OF PENNSYLVANIA

IN RE THE EDUCATIONAL ASSIGNMENT : SPECIAL EDUCATION
OF E.C., A STUDENT IN THE : OPINION NO. 1641
PHILADELPHIA CITY SCHOOL DISTRICT :

BEFORE APPEALS PANEL OFFICERS HEETER, LYTTLE AND MCAFEE
OPINION BY LYTTLE, APPELLATE OFFICER

## BACKGROUND

Student is a seventeen year old resident of the District, who is eligible for special education and related services as a child who has mild mental retardation and attention deficit disorder pursuant to the Individuals with Disabilities Education Act (IDEA) and Chapter 14. FF1. On June 17, 2003, prior to convening a scheduled due process hearing, the District and legally represented Parents entered into a Settlement Agreement which provided, *inter alia*, first, that the District would reimburse the Parents for tuition and required fees of Student's Approved Private School (APS) placement for the 2002-2003 school year. *See* SD3; FF2-4, 9. Second, the Agreement provided that the District would pay for Student's tuition and fees for placement at the same APS for the following school year (2003-2004). FF4; SD3. Third, the Agreement provided that "pendency after May 15th, 2004 [sic] will be a school district IEP offered on or before that date. If the school district fails to offer an IEP on or before that date, pendency would be tuition and reasonable fees at (the APS) thereafter." FF3-12, 14; NT35-36, 42; SD3.

Student attended the APS for the 2002-2003 and 2003-2004 school years, and the District paid the tuition and related costs retrospectively and prospectively as per the Agreement. FF14. In addition, on April 21, 2004, the District's psychologist initiated

and completed an evaluation of the Student. FF15-33; SD5. The psychologist's April 23, 2004 Educational Evaluation Report (ER) included: Student observations; academic, intellectual, behavioral, and social evaluations; parental input; and APS teacher interviews, input, checklists, and measures. The ER was supplemented with a speech/language evaluation (May 5, 2004) and an occupational therapy evaluation. FF15-40; SD4-6.

The Individualized Educational Program (IEP) team meeting was convened on May 7, 2004. FF45-85. The Parents rejected the 2004-2005 IEP because, although an "IEP document" was technically presented to the Parents within the Agreement's specified timeline, the IEP program was *in*appropriate. This, the parents surmised, was tantamount to no IEP offering at all. Parents continued Student's enrollment at the APS, a placement which parties and Hearing Officer agreed is "more than" appropriate. *See* footnote #4, *infra*. Parents, at the Due Process Hearing, requested tuition reimbursement and fees for the 2004-2005 school year, from the District, for failing to fulfill the Agreement. The District maintained that the 2004-2005 IEP proffered on May 7, 2004 was appropriate at the time of the offering, and that the Parents' reimbursement request should be denied.

The four-session due process hearing, at which Parents appeared *pro sé*, commenced on February 15, 2005, and ended June 15, 2005. The Hearing Officer, in her twenty-page Decision, dated July 22, 2005, identified the three following issues:

> "1. Did the School District of Philadelphia offer [Student] a free appropriate public education (FAPE) for the 2004-2005 school year as articulated in the IEP and NOREP of May 7, 2004?
>
> 2. If the District did not offer [Student] FAPE, is [sic] the placement chosen by the Parents appropriate?

3. If the District did not offer FAPE, and the placement chosen by the Parents is appropriate, does a balancing of the equities remove any or all of the District's obligation to provide tuition reimbursement?"
HO Dec. @ 2-3.

The Hearing Officer found the District's proffered 2004-2005 IEP appropriate and denied Parents' request for tuition reimbursement.

## ISSUES PRESENTED

Parents, continuing *pro sé*, filed Exceptions via an eleven page document, dated August 5, 2005, and marked as received by ODR, on August 8, 2005. On August 12, 2005, ODR forwarded this Record, via UPS Ground, to this Panel; whose members received it on August 15, 2005. Parents excepted to most elements of the Hearing Officer's Decision and Order.

The District requested an "extension" on August 18th. This Panel's chairperson received the request on August 19th and faxed a response denying the request since, it was believed, the District hadn't received the Decision (rather than Parents' Exceptions) until August 16th, thus rendering any extension unnecessary. On Tuesday, August 23rd, this Panel's chairperson received clarification that the District was requesting an extension to file its Answer to the Parents' Exceptions, rather than an extension to file District's own Exceptions. The chairperson contacted ODR's case manager who informed him that an additional 14-page document had been received from the District, which was then faxed to the chairperson upon request. The chairperson immediately responded to the District, denying its request for an extension to file its Answer as unnecessary, because the 10-day response time, from August 16th, had not yet lapsed.

3

On August 18, 2005, ODR received the District's Answer via a facsimile. The one-page document merely incorporated, as District's Answer, its closing brief, which was filed prior to the Hearing Officer rendering her decision. In its closing brief, the District countered Parents' tuition reimbursement demand, urging the Hearing Officer to deny Parents' request.

After a careful and comprehensive *de novo* review of the Record, we find that the Hearing Officer erred in her application of the law, and must grant the Parents' request to reverse.

## DISCUSSION

### Scope of Review

Critical here is an understanding of the Appeals Panels' scope of review, as enunciated in <u>Carlisle Area School District v. Scott P.</u>, 62 F.2d 520 (3d Cir. 1995), where the Third Circuit said:

> "We thus hold that appeals panels reviewing the fact findings of hearing officers ... should defer to the hearing officer's findings based upon credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." 62 F.3d at 529.

In <u>In Re The Educational Placement of R.S.</u>, Special Education Opinion #950 (1999), we analyzed this controlling precedent and held that:

> "Of critical import is the Hearing Officer's use of *pervasive, predominant*, or *overall*, denoting <u>general record support</u> for his conclusions <u>without denying the existence of such facts inapposite as parents</u> cite. In those modifiers obvious credibility determinations exist which, since <u>a whole record review or non-testimonial extrinsic evidence in it does not compel contrary conclusions, we can not reverse</u>. Similarly, the remaining parental

4

> Exceptions must also fail as they too would have us overturn credibility based determinations in the absence of a finding of record support for doing so. See <u>Carlisle Area School District v. Scott P.</u>, 62 F.2d 520 (3rd Cir. 1995)." (Emphasis by underline added.)

The point here, of course, is not whether the modifiers used by the Hearing Officer in <u>R.S.</u> are present here, which they clearly are not. Rather, it is that every Hearing Officer is empowered to make determinations, among other things as to evidentiary weight and credibility, and the record need not be devoid of contrary evidence. Thus, the import of <u>Carlisle's</u> holding is that Appeals Panels can reverse only when the *whole* record or non-testimonial extrinsic evidence *compels* a contrary conclusion and/or, obviously, there is an error of law. Measured against this standard, the Hearing Officer's decision in the present case must be reversed.

### **The District's IEP is Inappropriate**

IDEA requires that all eligible students receive a free appropriate public education (FAPE). The Supreme Court established the FAPE mandate to require "education specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley</u> 458 U.S. 176, 188-89, 102 S. Ct. 3034 (1984). FAPE is delivered via an IEP which must be responsive to the needs identified in the ER. A reevaluation is conducted every three years to determine if conditions have changed, not to reestablish eligibility. *See* 34 CFR §§ 300.532-536. The IEP team, utilizing the ER and IEP, determine the appropriate placement. IDEA requires placement in the least restrictive environment (LRE), that is, in a regular public school class, unless certain criteria are met. *See* 34 CFR §§ 300.550-554.

If FAPE is denied through district actions, tuition reimbursement is an appropriate remedy. Our early consideration of tuition reimbursement began with In Re the Educational Assignment of Timothy K., Special Education Opinion #554, where we held:

> This panel is in agreement with the critical point of the school district's argument. In fact, that position coincides with the legal principle that the right to reimbursement exists only where the proposed IEP would not have provided an appropriate program, and the parents continued with the prescribed procedures for challenging that IEP. See generally Knight v. District of Columbia, 877 F.2d 1025 (D.C.Cir. 1989); Murphy v. Commonwealth of Pennsylvania, Department of Education, 504 A.2d 382 (1986); Linkous v. Davis, 633 F.Supp. 1109 (W.D.Va. 1986)...
>
> In School Committee of the Town of Burlington, Mass. v. Dept. of Education of Mass., the Supreme Court held that parents may obtain reimbursement of private school tuition when a district offers their child an inappropriate educational placement and the parents unilaterally place the child in private school during the pendency of review proceedings. 471 U.S. 359,373-4 (1985). This is not a case where a district failed to inform the parents of their procedural rights. See Hall by Hall v. Vance City Board of Ed., 774 F.2d 629,633-4, n.4 (4th Cir. 1985).

Florence County School District Four v. Carter, 114 S.Ct. 361 (1993), confirmed this, with the United States Supreme Court holding that:

> In *School Comm. of Burlington v. Department of Ed. of Mass.*, 471 U.S. 359, 369 (1985), we held that IDEA's grant of equitable authority empowers a court to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act... In cases where cooperation fails, however, 'parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement.' *Id.*, at 370. For parents willing and able to make the latter choice, 'it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials.' *Ibid.*

That Court then added definition to the principle by stating:

> As this case comes to us, two issues are settled: 1) the school district's proposed IEP was inappropriate under IDEA, and 2) although Trident did not meet the § 1401(a)(18) requirements, it provided an education otherwise proper under IDEA. This case presents the narrow question whether Shannon's parents are barred from reimbursement because the private school in which Shannon enrolled did not meet the § 1401(a)(18) definition of a 'free appropriate public education.' We hold that they are not, because § 1401(a)(18)'s requirements cannot be read as applying to parental placements.
>
> Section 1401(a)(18)(A) requires that the education be 'provided at public expense, under public supervision and direction.' Similarly, § 1401(a)(18)(D) requires schools to provide an IEP, which must be designated by 'a representative of the local educational agency,' 20 U.S.C. § 1401(a)(20) (1988 ed., Supp. IV), and must be 'establish[ed],' and 'revise[d]' by the agency, § 1414(a)(5). These requirements do not make sense in the context of a parental placement. ... in such cases, where the private placement has necessarily been made over the school district's objection, the private school education will not be under 'public supervision and direction.' ... Moreover, IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free. *Burlington, supra,* at 373. To read the provisions of §1401(a)(18) to bar reimbursement in the circumstances of this case would defeat this statutory purpose.
>
> Nor do we believe that reimbursement is necessarily barred by a private school's failure to meet state education standards. Trident's deficiencies, according to the school district, were that it employed at least two faculty members who were not state-certified and that <u>it did not develop IEPS</u>. ... Indeed, the school district's emphasis on state standards is somewhat ironic. As the Court of Appeals noted, 'it hardly seems consistent with the Act's goals to forbid parents from educating their child at a school that provides an appropriate education simply because that school lacks the stamp of approval of the same public school system that failed to meet the child's needs in the first place.' 950 F.2d. at 164. Accordingly, we disagree with the Second Circuit's theory that 'a parent may not obtain reimbursement for a unilateral placement if that placement was in a school that was not on [the State's] approved list of private schools.' <u>Tucker</u>, 873 F.2d, at 568 (internal quotation marks omitted). Parents' failure to select a program known to be approved

by the State in favor of an unapproved option is not itself a bar to reimbursement. (Emphasis added).

In sum, if a district proffers an *in*appropriate IEP, parents continue to pursue due process rights under IDEA, and the student's private placement is deemed "proper" under the Act; parents are permitted to seek and receive tuition reimbursement. *See id.* Florence obviously established that "proper" means something short of technical adherence to every aspect of IDEA. Indeed, lack of a formal IEP requirement and continued references by the Court to "appropriate", indicates that unilateral parental placements calculated at their inception to afford the opportunity for "meaningful educational progress" would pass muster when not otherwise in strict conformity to IDEA. *See* Rowley, *supra*, Susan N., *supra*, and Fuhrmann v. East Hanover Board of Education, 993 F.2d 1031 (3d Cir. 1993). Retention of the FAPE standard in the 1997 Amendments to IDEA preserves this reasoning, while requiring ten days written notice to a district before placing a child privately. (20 USC § 1412(a)(10)(c)).

In the present case, the Hearing Officer conducted a fair and impartial hearing, and filed a comprehensive, well written Decision, as far as it went. However, we find that the Hearing Officer erred in applying the law regarding the transition plan element of this Student's 2004-2005 IEP. Consequently, the Hearing Officer's finding that the District met its burden of proof that its 2004-2005 IEP was appropriate is reversed; as is the Hearing Officer's denial of Parents' request for tuition reimbursement. The District's failure to timely offer an appropriate IEP, and thus FAPE, gives rise to Parents' tuition reimbursement claim.

In determining whether an award of tuition reimbursement is valid, the threshold question has always been whether the student was offered or provided with an

appropriate program, including *all the required elements[1]*, by his or her district. In order to be deemed appropriate, the program must be delivered in a regular public school classroom, unless certain criteria are met; and when offered, be "reasonably calculated" to confer "educational benefit", or "meaningful educational benefit", that is, not trivial nor de minimis. *See* Board of Education v. Rowley, 458 U.S. 176 (1982); Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171 (3rd Cir. 1988); Fuhrmann v. East Hanover Board of Education, 993 F.2d 1031 (3rd Cir. 1993); Susan N. v. Wilson School District, 70 F.3d 751 (3rd Cir. 1995); Neshaminy School District v. Karla B., 25 IDELR 725 (E.D. PA, 1997); Oberti v. Board of Education of the Borough of Clementon, 995 F.2d 1204 (3rd Cir. 1993); 20 USC § 1412(a)(5); 34 CFR § 300.550.

The controlling regulatory provision defining transition services, which is a culmination of previous similar requirements imposed by regulation at the time the District offered this IEP, states:

> "(a) As used in this part, *transition services* means a coordinated set of activities for a student with a disability that –
> (1) Is designed within an outcome-oriented process, that promotes movement from school to post-school activities, including postsecondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
> (2) Is based on the individual student's needs, taking into account the student's preferences and interests; and
> (3) Includes –
>    (i) Instruction;
>    (ii) Related services;
>    (iii) Community experiences;
>    (iv) The development of employment and other post-school adult living objectives; and
>    (v) If appropriate, acquisition of daily living skills and functional vocational evaluation.

---

[1] In the present case, the inappropriate Transition Plan is just such an "element".

9

(b) Transition services for students with disabilities may be special education, if provided as specially designed instruction, or related services, if required to assist a student with a disability to benefit from special education." 34 CFR § 300.29.

As for the process of transition planning, the regulations further provide that:

"(1) For each student with a disability beginning at age 14 (or younger, if determined appropriate by the IEP team), and updated annually, a statement of the transition service needs of the student under the applicable components of the student's IEP that focuses on the student's courses of study (such as participation in advanced-placement courses or a vocational education program); and

(2) For each student beginning at age 16 (or younger, if determined appropriate by the IEP team), a statement of needed transition services for the student, including, if appropriate, a statement of the interagency responsibilities or any needed linkages." 34 CFR § 300.347(b).

Not surprisingly, since transition planning's advent, numerous jurisdictions have administratively and judicially addressed transition plan appropriateness under these regulations. A nationwide mandate, to some degree axiomatic in light of this regulatory framework, has evolved from these cases. It requires a transition plan to meet state and federal criteria, identify all needs in a thorough transition evaluation, reflect the evaluation, and address all potential needs. Absent these elements, the plan is deemed *in*appropriate. *See* "IDEA, the Courts and the Law of Transition", McAfee and Greenwalt, 2001[2]; Novato Unified SD, 22 IDELR 1056 (SEA CA 1995), which invalidated checklist transition plans, and based on nonspecific goals and objectives, awarded compensatory education.

---

[2] Where otherwise specifically relied upon in this Decision, this article is appropriately referenced. However, it was also relied upon as a general tool to develop the overall analysis in this Decision.

Since 1990, courts have repeatedly addressed appropriateness of transition plans. Germane to this matter, they have found that without an ultimate placement objective, a school district could not establish coordinated activities directed towards desired outcomes. Where that was the case, no transition plan existed and a new IEP was required. *See* McAfee and Greenwalt, *supra*; Appendix "A" of authorities supporting this decision; Urban v Jefferson County, 21 IDELR 985 (Dist. CO 1994), aff'd 24 IDELR 465 (10th Cir. 1996).

In Mason City School District, 21 IDELR 248 (SEA IA 1994), an administrative proceeding found transition services for a student with severe disabilities were not initiated until two years before scheduled graduation. Further, the eventual plan was ruled overturned as it lacked specific delineation of school and vocational rehabilitation agency obligations, and did not reflect consideration of all required IDEA areas. Concluding, it was ruled that transition services must be planned and initiated in sufficient time to have the desired impact.

Requirements for planning and initiating transition services were also at issue in Lancaster Independent School District, 29 IDELR 281 (SEA TX 1998), where post graduation remedies were ordered. An administrative challenge to adequacy and service commencement, the transition plan was found inappropriate in not considering an independent educational evaluation. Despite career information and supplementary services, it did not supply specially designed instruction and related services which, given the student's disabilities, would have been of assistance in obtaining educational benefit. Likewise, in Puffer v. Raynolds, 19 IDELR 408 (SEA MI 1992), the court required the transition plan to specify how progress towards the projected outcomes, that is,

educational benefit, will be achieved before graduation, and permitted a compensatory education plan thereafter.

Community based instruction has also proven contentious. Illustrious of the results is <u>Appleton Area School District</u>, 27 IDELR 682 (SEA WI 1998), where a 19-year-old with cerebral palsy and mental retardation had earned enough credits to, and did participate in, graduation, only to be denied a diploma by the IEP team. That team then developed a plan for high school based classes in daily living, keyboarding, and survival skills with some community based instruction. Parents agreed with the delayed graduation, but opposed the specifics of the plan and requested that all instruction occur in the community. Parents prevailed as the student was found unable to generalize from the classroom to the community, creating a need for "real world" instruction to derive meaningful benefit.

In the present case, the District's transition plan is obviously not "a coordinated set of activities for a student with a disability" that is "designed within an outcome-oriented process" taking "into account the student's preferences and interests". *See e.g.*, P2. While the IEP "suggests" Parent and Student initiated and directed experiences, there is no evidence that the District provides Student with any transition services whatsoever. *See id.* @ 4,5,9; *see also*, SD4-6. Neither are any of the suggested activities coordinated towards a clear and specific set of goals or outcomes. *Id.* Moreover, the Student's preferences, interests, and current employment are ignored in future goals, measurable objectives, and school-supported programming; this alone rendering the transition plan highly questionable, if not inappropriate. *Id.* Mere "directives" or "suggestions" by the District of what the Parents and Student should or might do to ready the Student for post-

graduation life neither meets, nor terminates, the District's legal obligation to provide an appropriate transition plan and thus, IEP and, consequently, FAPE. *See specifically* P2 @ 4, 5, 9. Because of Student's chronological age (17) and, Student's near completion of District-provided public school education, the transition plan is a particularly critical "element"[3], and must be integrated thoroughly throughout this Student's entire IEP. Perhaps most disturbing is that the District's occupational therapist, who the District continuously emphasizes as the leader in identifying, coordinating, providing, and supporting student's "transitional programming", is designated in the IEP to meet with the Student only minimal times throughout the entire school year. *See* P2 @ 9. This inappropriate transition plan renders the entire IEP inappropriate.

Finally, we find that, because the District failed to offer the Student FAPE, the Parents are entitled to seek tuition reimbursement and fees for Student's 2004-2005 APS placement. The parties' Settlement Agreement provided, "that if the District failed to offer an IEP on or before May 15, 2004 pendency would remain the tuition and mandatory fees at [APS][4] thereafter." SD Resp. @ 5; *see also* SD1. Clearly the 2004-2005 IEP, offered by the District, by law, would have to be deemed an "appropriate IEP" pursuant to IDEA for this Settlement Agreement to be valid. We find that the District offered an *in*appropriate IEP and, as such, failed to offer Student an IEP within the timeline terms of the Agreement, and tuition reimbursement is the remedy provided.

Accordingly, we enter the following:

---

[3] *See* DISCUSSION @ 9, *supra*.
[4] There is no disagreement among the parties, nor the Hearing Officer, that the APS is "appropriate". The Hearing Officer and District both refer to the APS placement as a "Cadillac" program and placement for this Student. *See* SD Resp. @ 4; HO Dec. @ 16; *see also* FF86-89.

13

## **ORDER**

AND NOW, it is hereby ordered that the Decision and Order of the Hearing Officer are reversed. The District's 2004-2005 IEP is inappropriate. Parents are entitled to tuition reimbursement for the Student's 2004-2005 school year placement at the APS. All findings and conclusions of the Hearing Officer not inconsistent herewith are hereby approved and adopted. All exceptions not mentioned or addressed herein are hereby dismissed.

In accordance with 22 PA Code § 14.162(o), this Order may be appealed to the Commonwealth Court of Pennsylvania or the appropriate federal district court.


*Constance Fox Lyttle*
Constance Fox Lyttle, Ph.D., JD
for the Appeals Review Panel
Mailed: September 10, 2005